United States District Court
Southern District of Texas
**ENTERED**
June 06, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DONALD LLOYD DAVIS, JR.,        §
TDCJ #01762796,                 §
                                §
              Plaintiff,        §
                                §
v.                              §        CIVIL ACTION NO. H-19-1729
                                §
GLEN L. WISE, et al.,           §
                                §
              Defendants.       §

<u>**MEMORANDUM OPINION AND ORDER**</u>

State inmate Donald Lloyd Davis, Jr., has filed an Amended Complaint for civil rights violations under 42 U.S.C. § 1983 (Docket Entry No. 53) and a Brief for Amended Complaint ("Plaintiff's Brief") (Docket Entry No. 55), alleging that he was denied adequate medical care in a timely manner. He has also filed a "[Motion for] Summary Judgment" ("Plaintiff's MSJ") (Docket Entry No. 70), arguing that he is entitled to prevail on his claim that the defendants conspired to violate his rights. The medical providers identified by Davis in his Amended Complaint have filed Defendants' Motion for Summary Judgment ("Defendants' MSJ") (Docket Entry No. 80), and Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment ("Defendants' Response") (Docket Entry No. 83). Davis has filed a [Second Motion for] Summary Judgment ("Plaintiff's Second MSJ") (Docket Entry No. 90) and a document entitled Plaintiff['s] Initial Disclosure/Amended

Complaint ("Plaintiff's Response") (Docket Entry No. 93), which the court has construed as a response to the Defendants' MSJ (See Order, Docket Entry No. 108, pp. 2-3.).  After considering all of the pleadings, the court will grant the Defendants' MSJ and deny the motions filed by Davis for the reasons explained below.

## I.  Background and Procedural History

While confined at the Darrington Unit, Davis filed a 1983 Civil Rights Complaint With Jury Demand [and] Memorandum of Law ("Complaint") against the former Director of the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ"), Lorie Davis.[1]  His primary claim was that he was denied adequate medical care, or that care was delayed, for an injury that occurred when an officer stepped on his right foot during an altercation at the Polunsky Unit.[2]  At the court's request the State Attorney General's Office supplemented the pleadings with a report under Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978) ("Martinez Report"), which included over 800 pages of records related to care that Davis received from providers employed by the University of Texas Medical Branch ("UTMB").[3]

---

[1]Complaint, Docket Entry No. 1, p. 1.  For purposes of identification, all page numbers refer to the pagination imprinted by the court's electronic filing system, CM/ECF.

[2]Id. at 2-10.

[3]Martinez Report, Docket Entry No. 19; Appendix to Martinez Report, Docket Entry No. 19-1.

After reviewing all of the pleadings as required under the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915A(b), the court dismissed the Complaint in a Memorandum Opinion and Order entered on November 22, 2019.[4]   The Fifth Circuit affirmed the court's decision to dismiss the claims against Lorie Davis, who was succeeded as Director by Bobby Lumpkin, but vacated the decision to dismiss claims against "unidentified prison medical providers," who were accused of deliberately ignoring his injury by "purposefully misreading his charts" as part of a "cover-up scheme[.]"[5]   The claims against these prison medical providers were remanded for further proceedings.[6]

The court directed Davis to file an amended complaint identifying the medical providers who denied him adequate, timely care for his injured foot.[7] Davis identified the following medical providers who allegedly ignored the injury to his right foot and delayed his access to proper treatment:   (1) LVN Glen Wise; (2) Dr. James D. Geddes; (3) PA Paul K. Reilley; (4) Dr. Co Nguyen; (5) Dr. Edgar Hulipas; (6) RN Gregorio P. Paningbatan ("G. Paningbatan"); (7) LVN Sharla D. Madl; (8) RN April M.

---

[4]Memorandum Opinion and Order, Docket Entry No. 30.

[5]Davis v. Lumpkin, No. 19-20873 (5th Cir. June 2, 2022), Docket Entry No. 45, pp. 6-9.

[6]See id. at 9.

[7]Order for an Amended Complaint, Docket Entry No. 49, p. 4 ¶ 2.

Persinger; (9) PA Karen Faust; (10) RN Marilyn M. Paningbatan ("M. Paningbatan"); (11) RN Solly Mathew; (12) Dr. Philip L. Farley; (13) PA Israeldivine Kuyinu; (14) Dr. Gabriel Calles; (15) Dr. Deborah Stedman; (16) Dr. Robert Friedman; (17) RN Rona Baquero; and (18) LVN Monica Powell.[8]  His allegations against the defendants are summarized below.

## A.  Davis's Allegations

Davis was injured when officers used force to intervene in a fight that he had with another inmate on September 4, 2017.[9] Records show that Davis was involved in an altercation with another inmate that occurred in a day room at the Polunsky Unit.[10]  As a result of this altercation Davis was charged with a disciplinary offense for fighting without a weapon and causing injury to the other inmate.[11]

---

[8]Amended Complaint, Docket Entry No. 53, pp. 1-5.  Davis identifies LVN April M. Persinger as a defendant in his Amended Complaint, but the defendants indicate that her last name is now Frederick.  See Defendants' MSJ, Docket Entry No. 80, p. 15.  The court will refer to this defendant by the name shown in the medical records as RN Persinger.  For purposes of accuracy, the court has also corrected the names of two other defendants identified by Davis, RN Solly Mathew and Dr. Robert Friedman, by using the spelling provided in the defendants' pleadings.  See Defendants' MSJ, Docket Entry No. 80, p. 6.

[9]Amended Complaint, Docket Entry No. 53, p. 2 ¶ 3.

[10]Incident Report, Docket Entry No. 19-1, p. 5.

[11]Offense Report, Docket Entry No. 19-1, p. 61; TDCJ Disciplinary Report and Hearing Record, Docket Entry No. 19-1, p. 60.

Davis alleges that he saw LVN Wise after the use of force occurred on September 4, 2017, and that he told Wise that his foot hurt due to an officer stepping on it.[12]  Wise reportedly told Davis that he should not have been fighting and that he was "faking" an injury to try and get out of a disciplinary case.[13]

Two days later on September 6, 2017, Davis alleges that a correctional officer (Lieutenant Terrell) escorted him to the clinic in a wheelchair.[14]  According to Davis, Lieutenant Terrell looked at his foot and thought he needed to go to the hospital.[15] Davis was seen at the clinic by RN Persinger, who reportedly "down played" the injury although his foot was "purple" and swollen.[16] That same day PA Reilley took x-rays of Davis's foot and told him there was "no brake [sic] or fracture" to cover up for the officer who stepped on him and UTMB because "they" failed to treat him in a timely fashion.[17]

On September 8, 2017, Davis was taken to the medical department because he put "a rope around [his] neck."[18]  Davis

---

[12]Amended Complaint, Docket Entry No. 53, p. 1 ¶ 1.

[13]Id.

[14]Plaintiff's Response, Docket Entry No. 93, p. 2 ¶ 2.

[15]Id.

[16]Amended Complaint, Docket Entry No. 53, p. 1 ¶ 2.

[17]Id. at 2 ¶ 3.

[18]Id. at ¶ 4.

-5-

reportedly asked LVN Wise to send him to the hospital because he was in so much pain, but Wise refused.[19]   Instead, Davis was sent to the Jester IV Unit,[20] which is a psychiatric facility.[21]

When Davis arrived at the Jester IV Unit on September 8, 2017, he told RN M. Paningbatan that his foot was broken.[22]   She contacted an unidentified unit physician, who reportedly looked at Davis's "chart" and noted that there was no fracture based on the x-rays taken by PA Reilley.[23]   Davis reportedly asked RN M. Paningbatan and RN G. Paningbatan to call 911 so that he could go to the hospital, but the nurses said they could not do so without a doctor's order.[24] RN M. Paningbatan contacted a unit physician, who stated that he would see Davis on September 11, 2017, but Davis alleges that Dr. Farley and Dr. Nguyen also refused to call 911 and send him to a hospital on September 8, 2017.[25]

---

[19]Id.

[20]Id.

[21]See Texas Department of Criminal Justice - Unit Directory, available at: https://www.tdcj.texas.gov/unit_directory/index.html (last visited May 23, 2023).   Although the Jester IV Unit is now known as the Wayne Scott Unit, the court will continue to refer to the facility as the Jester IV Unit for purposes of this Memorandum Opinion and Order because that is what it was called when Davis was treated there during 2017 and 2018.

[22]Amended Complaint, Docket Entry No. 53, p. 2 ¶ 5.

[23]Id.

[24]Id. ¶¶ 5-6.

[25]Id.

On September 11, 2017, Davis claims that Dr. Nguyen refused to take his injury seriously and would not see him that day because Davis was not on his housing unit.[26]  Davis saw Dr. Nguyen the following day, September 12, 2017, but Dr. Nguyen told him that his chart said there was no fracture in his right foot.[27]  Davis pointed out that his foot was "swollen, purple, and red."[28]  Dr. Nguyen agreed to have another x-ray done, but would not send Davis to the hospital because he believed that the issue should be handled at Davis's unit of assignment.[29]

On September 13, 2017, Davis was sent to the Huntsville Unit, where he stayed for one night while on his way back to the Polunsky Unit.[30]  During a medical examination at the Huntsville Unit Davis states that PA Faust took x-rays of his foot and told him that sometimes there are "fractures so small" that they do not show up on an x-ray.[31]  Without seeing Davis in person, two radiologists (Dr. Calles and Dr. Stedman) looked at the x-rays and concluded that there was no fracture or "acute bony abnormality[.]"[32]

---

[26]Id. ¶ 6.

[27]Id. at 3 ¶ 7.

[28]Id.

[29]Id.

[30]Id. ¶ 8.

[31]Id.

[32]Id.

PA Faust reportedly told Davis that she would contact his unit of assignment so that he could be seen by a provider who would "maybe" send him to the hospital for treatment within the next 10 days.[33]

On September 14, 2017, Davis arrived back at the Polunsky Unit where he was seen in the medical department.[34]  Davis claims that he saw Dr. Geddes and LVN Madl, who told him that he was going to be transferred back to his unit of assignment (the Ramsey I Unit) and would see a medical provider when he got there on September 16, 2017.[35]

Davis arrived at the Ramsey I Unit on September 16, 2017, but there were no medical personnel available because of Hurricane Harvey.[36]  Instead, Davis was taken to the nearby Stringfellow Unit, which he describes as a "HUB Unit."[37]  Davis alleges that PA Kuyinu did not do his own assessment when examining him at the Stringfellow Unit.[38]  Instead, Kuyinu looked at Davis's chart, which indicated that x-rays showed no fracture in his foot, and declined to send Davis to the hospital.[39]  Kuyinu prescribed Ibuprofen for

---

[33] Id.

[34] Id. ¶ 9.

[35] Id.

[36] Id. ¶ 10.

[37] Id.

[38] Id.

[39] Id. at 3-4 ¶ 10.

pain and scheduled an appointment for Davis with a provider at the Ramsey I Unit.[40]

When Davis saw LVN Powell at the Ramsey I Unit on September 17, 2017, he told her that he was in pain and needed to go to the hospital because his foot had been "purple, red, [and] swollen" since September 4, 2017.[41]  Powell reportedly told Davis that a correctional officer told her that he was "faking to get out [of] a [disciplinary] case" and that she was not going to send him to the hospital because his chart said there was no fracture.[42]

On September 20, 2017, Davis returned to the Jester IV Unit, where he told RN Mathew that he was in pain.[43]  He asked RN Mathew to go to the hospital because his foot was "purple, red, and swollen," but she told him that she could not do so without a doctor's order.[44]

Dr. Nguyen examined Davis at the Jester IV Unit on September 21, 2017, and agreed to send him to the hospital for a CT scan on his right foot.[45]  On September 24, 2017, Davis demanded to go to the hospital because he was in "too much pain[.]"[46]

_____

[40]Id. at 4 ¶ 10.

[41]Id. ¶ 11.

[42]Id.

[43]Id. ¶ 12.

[44]Id.

[45]Id. ¶ 13.

[46]Id. ¶ 14.

Dr. Friedman was notified, but refused to send him to the hospital and "pushed [Davis] off" on Dr. Nguyen.[47]

On September 28, 2017, Davis was sent to the UTMB Hospital in Galveston for a CT-scan.[48] After the scan was completed Davis returned to the Jester IV Unit, where he was told that his big toe ("Greate [sic] toe distal phalanx") was fractured.[49] Despite this diagnosis, Davis claims that nothing was done to treat his fractured toe and feared that he could die from "complications."[50]

On October 2, 2017, Davis was sent to the Darrington Unit and then to the Ramsey I Unit.[51] When officials refused to send him to the hospital Davis claims that he "tied pants around [his] neck" because he could not take the pain.[52] The following day Dr. Hulipas sent Davis back to the Jester IV Unit.[53]

On October 3, 2017, Davis arrived at the Jester IV Unit where he claims that RN Mathews would not send him to the hospital even after reading his charts.[54] Davis stayed at the Jester IV Unit until October 20, 2017, when he was sent back to the Ramsey I

---

[47]Id.

[48]Id. at 5 ¶ 15.

[49]Id.

[50]Id. ¶ 16.

[51]Id. ¶ 17.

[52]Id.

[53]Id.

[54]Id. ¶ 18.

Unit.[55]  Davis reportedly told RN Baquero that he needed to go to the hospital because his foot was getting worse, but she refused to send him to the hospital.[56]

Davis alleges that he did not get proper treatment for the toe that was fractured on September 4, 2017, until he was given a "medical boot" on October 23, 2021.[57]  As a result of this lengthy delay, Davis contends that he now has a "life long injury" because he "lost function in his foot/toe."[58]  Davis blames the lack of adequate medical care on a conspiracy by the defendants to purposely misdiagnose his fractured toe.[59]  Davis alleges that UTMB trains its medical personnel to cover up for an officer when an inmate is injured and that their collective refusal to treat his fractured foot was part of a conspiracy to prevent a civil rights complaint.[60]  He seeks compensatory and punitive damages from the defendants for the violation of his civil rights.[61]

---

[55]Id. ¶¶ 19-20.

[56]Id. ¶ 20.

[57]Plaintiff's MSJ, Docket Entry No. 70, p. 1 ¶ 3.

[58]Id.; Plaintiff's Response, Docket Entry No. 93, p. 3 ¶ 5.

[59]Plaintiff's Response, Docket Entry No. 93, p. 1.

[60]Amended Complaint, Docket Entry No. 53, pp. 1-2 ¶¶ 1-3; Plaintiff's Brief, Docket Entry No. 55, p. 2 ¶ 2; Plaintiff's Response, Docket Entry No. 93, pp. 1-2 ¶ 1.

[61]Plaintiff's Response, Docket Entry No. 93, p. 8 ¶ 13.  Davis also seeks attorneys' fees, see id., which he is not entitled to receive as a pro se litigant.  See Rheuark v. Shaw, 628 F.2d 297, 300 n.1 (5th Cir. 1980) ("Congress intended 42 U.S.C. § 1988 to compensate attorneys not pro se litigants.").

**B.   Summary Judgment Motions**

Davis has filed a motion for summary judgment, arguing that the evidence will show that his foot was broken on September 4, 2017, but that the defendants engaged in a conspiracy to deprive him of adequate care.[62]   In support, Davis references medical records from the examination by PA Reilley, who reviewed x-rays of his foot and diagnosed a contusion on September 6, 2017, but no fracture.[63]   Davis argues that the cover-up was "exposed" on September 28, 2017, but that medical care for his broken foot was delayed until October 23, 2017, when he received a "medical boot."[64]

The defendants also move for summary judgment and have presented copies of Davis's grievances and medical records.[65]   In addition, the defendants have provided a detailed affidavit from Dr. Glenda Adams, who has summarized the medical records of

---

[62]Plaintiff's MSJ, Docket Entry No. 70, p. 1 ¶ 2.

[63]Id. (referencing a document that is Bates stamped Davis_114 in the Appendix to the Martinez Report, which is a Correctional Managed Care Addendum Note, Docket Entry No. 19-1, p. 117).

[64]Id. ¶ 3.   Davis alleges that the cover-up was exposed on September 24, 2017, but he appears to mean September 28, 2017, when he received a CT scan of his right foot at UTMB Hospital in Galveston and a fracture in his big toe was detected.   See Amended Complaint, Docket Entry No. 53, p. 5 ¶ 15.

[65]TDCJ Relevant Grievance Records for Donald Davis ("Grievance Records"), Exhibit A to Defendants' MSJ, Docket Entry No. 80-1; TDCJ Medical Records for Donald Davis ("Medical Records"), Exhibit B to Defendants' MSJ, Docket Entry No. 81.   Other than records of treatment from the UTMB Hospital in Galveston, all of Davis's care was provided at TDCJ facilities by Correctional Managed Care ("CMC") personnel, although some of the later records also refer to Correctional Managed Health Care ("CMHC").

treatment that Davis received for his complaints of foot pain by the defendants and other medical providers employed by UTMB.[66]   The defendants argue that Davis does not demonstrate that a constitutional violation occurred in connection with his medical care and that his claims are barred by the Eleventh Amendment as well as the doctrine of qualified immunity.[67]

Davis has filed a second motion for summary judgment, which repeats his argument that the defendants intentionally misdiagnosed his broken toe as part of a conspiracy to violate his rights.[68]   The parties' arguments are considered below under the applicable legal standards.

## II.   <u>Standard of Review</u>

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.   Under this rule a reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a) (2021); <u>see also Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2552 (1986).   A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law.

---

[66]Affidavit of Glenda M. Adams, M.D., M.P.H. ("Adams Affidavit"), Exhibit E (Part One) to Defendants' MSJ, Docket Entry No. 81-3, pp. 2-25.

[67]Defendants' MSJ, Docket Entry No. 80, pp. 10-23.

[68]Plaintiff's Second MSJ, Docket Entry No. 90, pp. 1-2.

Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. Id.

In deciding a summary judgment motion the reviewing court must view all facts and inferences in the light most favorable to the nonmovant and resolve all factual disputes in his favor. See Shah v. VHS San Antonio Partners, L.L.C., 985 F.3d 450, 453 (5th Cir. 2021). If the movant demonstrates an "'absence of evidentiary support in the record for the nonmovant's case,'" the burden shifts to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial." Sanchez v. Young County, Texas, 866 F.3d 274, 279 (5th Cir. 2017) (quoting Cuadra v. Houston Indep. Sch. Dist., 626 F.3d 808, 812 (5th Cir. 2010)). The nonmovant cannot avoid summary judgment by resting on his pleadings or presenting "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." Jones v. Lowndes County, Mississippi, 678 F.3d 344, 348 (5th Cir. 2012) (internal citation and quotation marks omitted); see also Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (a nonmovant cannot demonstrate a genuine issue of material fact with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence).

The plaintiff represents himself in this case. Courts are required to give a pro se litigant's contentions a liberal construction. See Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007)

(per curiam). Nevertheless, a <u>pro se</u> litigant is not excused from meeting his burden of proof of specifically referring to evidence in the summary judgment record and setting forth facts showing that there is a genuine issue of material fact remaining for trial. <u>See Outley v. Luke & Associates, Inc.,</u> 840 F.3d 212, 217 (5th Cir. 2016).

## III.   <u>Discussion</u>

**A.   Eleventh Amendment**

The defendants argue that the claims against them in their official capacities as state employees are barred by the Eleventh Amendment.[69]   Unless expressly waived, the Eleventh Amendment bars an action in federal court by a citizen of a state against his or her own state, including a state agency. <u>See Will v. Michigan Dep't of State Police,</u> 109 S. Ct. 2304, 2309 (1989). The Eleventh Amendment also bars a federal action for monetary damages against state officials when the state itself is the real party in interest. <u>See Pennhurst State School & Hospital v. Halderman,</u> 104 S. Ct. 900, 908-09 (1984). A suit against a state official in his or her official capacity is considered a suit against the state itself. <u>See Will,</u> 109 S. Ct. at 2312 ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As

_____

[69]Defendants' MSJ, Docket Entry No. 80, pp. 10-11.

-15-

such, it is no different from a suit against the state itself."
(internal citations omitted)).

Texas has not waived its Eleventh Amendment immunity and
Congress did not abrogate that immunity when it enacted 42 U.S.C.
§ 1983.  See NiGen Biotech, L.L.C. v. Paxton, 804 F.3d 389, 394
(5th Cir. 2015) (citing Quern v. Jordan, 99 S. Ct. 1139, 1145
(1979)).  Because UTMB is a state agency, the defendants are
entitled to immunity from any claim for monetary damages against
them in their official capacity as state employees.  See Oliver v.
Scott, 276 F.3d 736, 742 (5th Cir. 2002).  Therefore, the
defendants are entitled to summary judgment on this issue.

**B.   Claims of Deliberate Indifference**

The defendants contend that there is no evidence to support
Davis's claim that they were deliberately indifferent to his
medical needs or violated his constitutional rights.[70]  Arguing
further that Davis fails to demonstrate a constitutional violation
or show that their actions were objectively unreasonable, the
defendants assert their entitlement to qualified immunity from his
claims against them in their personal capacity.[71]

"The doctrine of qualified immunity protects government
officials 'from liability for civil damages insofar as their
conduct does not violate clearly established statutory or

---

[70]Defendants' MSJ, Docket Entry No. 80, pp. 11-17.

[71]Id. at 21-23.

constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 102 S. Ct. 2727, 2738 (1982)). "'[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'" Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012) (quoting Anderson v. Creighton, 107 S. Ct. 3034, 3038 (1987) (citation omitted)).

"[A] good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." Ratliff v. Aransas County, Texas, 948 F.3d 281, 287 (5th Cir. 2020) (internal quotation marks and citation omitted). Once the defense is invoked by a defendant, "the plaintiff must rebut it by establishing (1) that the [defendant] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" Rich v. Palko, 920 F.3d 288, 294 (5th Cir. 2019) (quoting District of Columbia v. Westby, 138 S. Ct. 577, 589 (2018) (citation omitted)). A plaintiff seeking to meet this burden at the summary-judgment stage "may not rest on mere allegations or unsubstantiated assertions but must point to specific evidence in the record demonstrating a material fact issue concerning each element of his claim." Mitchell v. Mills, 895 F.3d 365, 370 (5th Cir. 2018) (citations omitted).

Davis's claims concerning his medical care are governed by the Eighth Amendment, which prohibits cruel and unusual punishment, i.e., the "unnecessary and wanton infliction of pain." Wilson v. Seiter, 111 S. Ct. 2321, 2323 (1991) (citation omitted). Prison officials are required by the Eighth Amendment to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" Farmer v. Brennan, 114 S. Ct. 1970, 1976 (1994) (internal quotation marks omitted). To establish a claim for the denial of adequate medical care, a prisoner must demonstrate that prison officials violated the Eighth Amendment by acting with "deliberate indifference to a prisoner's serious illness or injury[.]" Estelle v. Gamble, 97 S. Ct. 285, 291 (1976).

The deliberate indifference standard is an "extremely high" one to meet. Domino v. Texas Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 114 S. Ct. at 1979. A prison official acts with the requisite deliberate indifference "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 1984.

A prisoner who alleges that he was denied medical care with deliberate indifference must demonstrate that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006) (citation and internal quotation marks omitted). "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." Id. (citations omitted).

As noted above, the defendants have provided medical records related to Davis's claims that he was denied timely, adequate medical care for the fractured toe that he sustained at the Polunsky Unit on September 4, 2017. "Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference." Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995) (citing Mendoza v. Lynaugh, 989 F.2d 191, 193-95 (5th Cir. 1993)). Davis's claim that the denial of care was the result of a conspiracy and his claims against the individual defendants are examined separately below following a summary of the pertinent medical records.

1. Summary of Davis's Medical Care

Dr. Adams reports that Davis arrived at TDCJ in 2012 with a history of mental illness, including attention deficit

-19-

hyperactivity disorder ("ADHD"), depression, and bipolar disorder, but no medical problems.[72]   On August 27, 2017, Davis and other inmates were evacuated from the Ramsey I Unit in Brazoria County and were reassigned to the Polunsky Unit due to flooding caused by Hurricane Harvey.[73]  The medical records show that LVN Wise examined Davis at the Polunsky Unit on September 4, 2017, following a use of force that involved deploying a chemical agent.[74]  Davis reportedly denied having any injuries or respiratory difficulties.[75]  Wise did not observe any injuries or respiratory distress and released Davis to security.[76]

Later in the afternoon on September 4, 2017, Davis returned to the Polunsky Unit clinic and reported that he was suicidal.[77]  The nurse who examined Davis contacted a medical provider, who ordered him to be placed under constant supervision until a crisis management bed was available.[78]  Davis did not mention a physical injury to either provider and seemed more concerned about his

---

[72]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 3.

[73]Id. at 4.

[74]CMC Use of Force Nursing Note, Exhibit 4 to Adams Affidavit, Docket Entry No. 81-3, p. 91.

[75]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 4.

[76]Id.

[77]Id.

[78]Id. at 4-5.

-20-

potential placement in segregated confinement as a result of receiving a disciplinary case for fighting.[79]

Davis was seen again in the Polunsky Unit clinic on September 6, 2017, where he reported that his foot was injured during a fight with another offender when an officer "stepped on his toe and hit his ankle causing the pain."[80]   RN Persinger prescribed acetaminophen for pain and scheduled a follow-up appointment for Davis to see a medical provider for an x-ray.[81] Later that day Davis was treated by PA Reilley for reports of severe pain in his "right 1st and 2nd toes" and right ankle.[82] PA Reilley ordered x-rays after noting that Davis's toes were "red and swollen" and that his ankle was also swollen.[83]

Davis returned to the Polunsky Unit clinic in a wheelchair on September 7, 2017, where PA Reilley noted "mild swelling" of the "1st [and] 2nd toes" on the right foot.[84]   Radiologists who reviewed the x-rays found "no fracture or dislocation" and noted that the

---

[79]Id. at 5 (citing Exhibit 4 to Adams Affidavit, CMC Nursing Protocol for Psychiatric Symptoms, Docket Entry No. 81-3, pp. 92-98 and CMC Outpatient Mental Health Services, p. 100).

[80]CMC Nursing Protocol for Musculoskeletal Symptoms, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 109.

[81]Id. at 110-11.

[82]CMC Clinic Notes - Nursing, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 112.

[83]Id. at 112-13.

[84]CMC Addendum Note, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 116.

-21-

soft tissues were "unremarkable."[85]  PA Reilley diagnosed a "right foot contusion" and prescribed "crutches, weight bearing as tolerated," and pain medicine.[86]

On September 7, 2017, Davis began making threatening remarks after disciplinary charges were filed against him.[87]  He also indicated that he was unhappy with his medical treatment.[88]  The mental health provider who saw him that day concluded that Davis showed signs of antisocial personality disorder and would likely continue to engage in manipulative, confrontational, and oppositional behavior that was "goal-directed" in an attempt to dictate his treatment.[89]

On September 8, 2017, Davis was sent to the Jester IV Unit for crisis management after he put a strip of cloth around his neck and threatened suicide.[90]  When Davis arrived at the Jester IV facility, RN M. Paningbatan noted during an intake examination that Davis's right big toe was swollen and referred Davis's chart for review by

---

[85]Id.; see also CMC Radiology Report, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 119.

[86]CMC Addendum Note, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 116; CMC Nursing Chart Review - Verbal Order Note, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, pp. 117-18.

[87]CMC Outpatient Mental Health Services, Exhibit 6 to Adams Affidavit, Docket Entry No. 81-3, p. 125.

[88]Id.

[89]Id. at 124.

[90]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 6 (citing Exhibit 7 to Adams Affidavit, CMC Nursing Protocol for Psychiatric Symptoms, Docket Entry No. 81-3, p. 136).

a provider.[91]  Davis was seen by a mental health provider who confirmed a diagnosis of antisocial personality disorder and provided crisis intervention counseling.[92]  Later that night Davis told RN G. Paningbatan that his foot was broken and that he needed to go to the hospital.[93]  RN G. Paningbatan confirmed that Davis had pain medication and that he was scheduled to see a provider for his complaints of foot pain.[94]

Davis remained in crisis management for his mental health from September 8 through September 12, 2017.[95]  On September 9, 2017, a nurse observed that he was standing and that he had pain medication as well as a referral to be seen by a medical provider for his swollen toe.[96]  On September 10, 2017, another nurse observed Davis standing at his door, smiling, and bearing weight on his right leg without apparent distress.[97]  She documented that his foot had some

---

[91]CMC Inpatient RN Assessment, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, p. 140.

[92]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 7 (citing Exhibit 7 to Adams Affidavit, CMC Mental Health Services, Docket Entry No. 81-3, pp. 146-48).

[93]Id. (citing Exhibit 7 to Adams Affidavit, CMC Inpatient Nursing Progress Note, Docket Entry No. 81-3, p. 149).

[94]Id.

[95]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 8.

[96]CMC Inpatient Nursing Progress Note, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, p. 150.

[97]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 8 (citing Exhibit 7 to Adams Affidavit, CMC Inpatient Nursing Progress Note, Docket Entry No. 81-3, p. 151).

redness and minimal swelling, but that he was able to wiggle his toes well.[98]

On September 11, 2017, Dr. Nguyen reviewed the nurses' notes and scheduled an appointment to see Davis the following day.[99]  On September 12, 2017, Dr. Nguyen saw Davis in the Jester IV Unit clinic and ordered another x-ray of his right foot.[100]  Later that day Davis was discharged from crisis management and cleared to return to his unit of assignment.[101]

On September 13, 2017, Davis departed from the Jester IV Unit and had a layover at the Huntsville Unit, where PA Faust examined him and ordered the x-rays that had been authorized by Dr. Nguyen.[102]  Two radiologists (Dr. Calles and Dr. Stedman) reviewed the new x-rays of Davis's right foot and found "no acute fracture or dislocation," but they did note diffuse swelling of his forefoot.[103]  PA Faust issued crutches as well as a bottom-bunk

---

[98]Id.

[99]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 7 (citing Exhibit 7 to Adams Affidavit, Email Correspondence dated Sept. 11, 2017, Docket Entry No. 81-3, p. 155).

[100]CMC Clinic Notes, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, p. 156.

[101]CMC Mental Health Services, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, pp. 158-60.

[102]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 9.

[103]CMC Radiology Report, Exhibit 8 to Adams Affidavit, Docket Entry No. 81-3, p. 164.

restriction and scheduled Davis for a follow-up appointment with a provider at his assigned unit.[104]

On September 14, 2017, Davis returned to the Polunsky Unit and was seen by a mental health provider who noted that his housing assignment was temporary because he was an "evacuee" from Ramsey I Unit.[105] LVN Madl saw him in the clinic that day for transfer screening and noted that Davis had a dental appointment.[106] Davis was escorted to the dental clinic, where his appointment was rescheduled.[107] Madl issued a routine referral for a follow-up appointment with medical, mental health, and dental providers.[108]

Davis was seen by a mental health provider on September 15, 2017.[109] Davis expressed dissatisfaction with his medical care and told the provider he needed to go a "freeworld hospital to receive 'morphine pills.'"[110] The provider observed that Davis was not in

---

[104]CMC Nursing Protocol for Musculoskeletal Symptoms, Exhibit 8 to Adams Affidavit, Docket Entry No. 81-3, pp. 170-71; CMC Reminder Import Log, Exhibit 9 to Adams Affidavit, Docket Entry No. 81-3, p. 179.

[105]CMC Outpatient Mental Health Services, Exhibit 9 to Adams Affidavit, Docket Entry No. 81-3, p. 173.

[106]CMC Medical and Mental Health Transfer Screen, Parts III & IV, Exhibit 9 to Adams Affidavit, Docket Entry No. 81-3, p. 175.

[107]Id.

[108]Id. at 178.

[109]CMC Outpatient Mental Health Services, Exhibit 9 to Adams Affidavit, Docket Entry No. 81-3, p. 181.

[110]Id.

distress and noted that he would be seen when he returned to his unit of assignment that weekend.[111]

On September 16, 2017, Davis arrived at the Ramsey I Unit and was examined for complaints of foot pain at the nearby Stringfellow Unit, which is a HUB facility that has nursing staff available after regular clinic hours.[112]  Davis was treated by a nurse who noted that he was not in acute distress, but that he complained of pain.[113] Under the direction of PA Kuyinu, the nurse dispensed pain medication and scheduled Davis to see a unit provider the next morning.[114]  An appointment was scheduled for September 18, 2017.[115] Before he could be seen for this appointment, however, Davis was referred for crisis management following another threat of self-harm.[116]

Davis returned to the Jester IV Unit shortly after midnight on September 20, 2017, and was evaluated by RN Mathew.[117]  RN Mathew

---

[111]Id.

[112]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 10 & n.27.

[113]Nurse Triage Form, Exhibit 10 to Adams Affidavit, Docket Entry No. 81-3, p. 187.

[114]Id.; see also CMC Return to Clinic Pass, Exhibit 10 to Adams Affidavit, Docket Entry No. 81-3, p. 189; Prescription dated Sept. 16, 2017, Exhibit 10, Docket Entry No. 81-3, p. 190.

[115]CMC Reminder Import Log, Exhibit 11 to Adams Affidavit, Docket Entry No. 81-3, p. 192.

[116]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 11 (citing Exhibit 11, CMC Outpatient Mental Health Services, Docket Entry No. 81-3, pp. 195-96).

[117]CMC Mental Health Services, Exhibit 12 to Adams Affidavit, Docket Entry No. 81-3, pp. 203-05.

noted that Davis had swelling in his right foot from being stepped on by an officer and that he was taking Motrin for pain.[118]   RN Mathew sent Davis's chart to Dr. Nguyen, who scheduled Davis for a lay-in appointment the next day.[119]   Davis was seen in the clinic later on September 20, 2017, where he reported having chest pain.[120] Davis received an electrocardiogram ("EKG"), which was normal, and returned to his cell.[121]   Later that afternoon Davis told a mental health clinician who was providing crisis intervention counseling that he staged the suicide attempt at the Ramsey I Unit because he was unhappy with his medical care and wanted treatment for his foot.[122] The clinician noted, however, that Davis's previous x-rays showed no indications of a fracture.[123]

On September 21, 2017, Davis was seen in the Jester IV Unit clinic for complaints of continued pain in his right foot.[124] Dr. Nguyen noted that the x-rays ordered by PA Faust disclosed no

---

[118]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 11 (citing Exhibit 12 to Adams Affidavit, CMC Inpatient RN Assessment, Docket Entry No. 81-3, p. 208).

[119]Id. (citing Exhibit 12 to Adams Affidavit, Email Correspondence dated Sept. 20, 2017, Docket Entry No. 81-3, p. 209).

[120]CMC Urgent/Emergent Care Record, Exhibit 12 to Adams Affidavit, Docket Entry No. 81-3, pp. 214-20.

[121]Id. at 217, 220; Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 12.

[122]CMC Mental Health Services, Exhibit 12 to Adams Affidavit Docket Entry No. 81-3, p. 222.

[123]Id.

[124]CMC Clinic Notes, Exhibit 13 to Adams Affidavit, Docket Entry No. 81-3, p. 228.

-27-

fracture and recommended a referral for a CT scan of Davis's foot
to rule out a "Lisfranc injury."[125]   The treatment plan was to
maintain Davis's safety with follow-up monitoring for "health and
behavior" while watching for the appointment to be set.[126]   The CT
scan appointment was scheduled for September 28, 2017, at the UTMB
Hospital in Galveston.[127]

On September 22, 2017, Davis was discharged from crisis
management, but he remained at Jester IV Unit to participate in a
Diagnosis and Evaluation ("D&E") program due to his continued
reports of suicidal thoughts.[128]   On September 24, 2017, Davis
complained of pain in his right leg, but refused his medication.[129]
Davis was told that he had an appointment at UTMB Hospital the
following week, but he remained angry and demanding.[130]   Later that
day security escorted Davis to a nurse's station after he refused
to leave the shower and began acting out.[131]   Davis was described as

---

[125]Id. at 229; UTMB CMC Health Service Referral Request,
Exhibit 13 to Adams Affidavit, Docket Entry No. 81-3, p. 231.

[126]CMC Inpatient Nursing Progress Note, Exhibit 13 to Adams
Affidavit, Docket Entry No. 81-3, p. 233.

[127]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 13.

[128]Id.; CMC Addendum Note and CMC Mental Health Services,
Exhibit 14 to Adams Affidavit, Docket Entry No. 81-3, pp. 235, 237-
38.

[129]CMC Inpatient Nursing Progress Note, Exhibit 14 to Adams
Affidavit, Docket Entry No. 81-3, p. 241.

[130]Id.

[131]CMC Inpatient Nursing Progress Note, Exhibit 14 to Adams
Affidavit, Docket Entry No. 81-3, p. 243.

angry, demanding, threatening, and insisting that he go to the hospital for the pain in his right foot.[132]   The nurse who saw him notified the physician on call (Dr. Friedman), who advised her to schedule a follow-up appointment with Dr. Nguyen.[133]

On September 25, 2017, Dr. Nguyen scheduled an appointment for Davis the following week.[134]   Subsequently, Davis was evaluated by a psychiatrist who noted that Davis was agitated and angry about not being "sent off site" to receive medical care for his foot.[135] The treatment provider prescribed Risperdal for Davis's "anger, reactivity, thought distortion, mood stability, [and] over-heightened emotions."[136]

On September 28, 2017, Davis traveled to the UTMB Hospital for a CT scan.[137]   The radiologist who reviewed the results of that test diagnosed a "[g]reat toe distal phalanx fracture" with soft tissue swelling.[138]   Dr. Adams explains that a phalanx is a small bone

---

[132]Id.

[133]Id.

[134]Email Correspondence dated Sept. 25, 2017, Exhibit 15 to Adams Affidavit, Docket Entry No. 81-3, p. 246.

[135]CMC Mental Health Services, Exhibit 15 to Adams Affidavit, Docket Entry No. 81-3, p. 249.

[136]CMC Mental Health Services, Exhibit 15 to Adams Affidavit, Docket Entry No. 81-4, p. 3.

[137]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 14; CMC MD/MLP Chart Review, Exhibit 16 to Adams Affidavit, Docket Entry No. 81-4, pp. 22-23.

[138]CMC MD/MLP Chart Review, Exhibit 16 to Adams Affidavit, Docket Entry No. 81-4, p. 23; CMC Radiology Report, Exhibit 16 to Adams Affidavit, Docket Entry No. 81-4, p. 25.

found in a finger or toe.[139]  When Davis returned to the Jester IV
Unit Dr. Nguyen issued an order to treat his fractured big toe with
"buddy tape."[140] Dr. Adams explains that "buddy taping" involves
taping one digit to an adjacent digit, which is a common practice
for immobilizing an "uncomplicated" fracture of a finger or toe.[141]

On September 29, 2017, Davis was treated with buddy tape in
the clinic and advised to rest while keeping his foot elevated.[142]
Dr. Nguyen also requested an "ortho foot referral" so that he could
be seen by an orthopedic specialist at the UTMB Hospital in
Galveston,[143] which was scheduled for October 9, 2017.[144]

Davis also saw a mental health clinician on September 29,
2017, who conducted a detailed evaluation of his antisocial
personality disorder and noted that he displayed characteristics of
borderline and narcissistic personality disorders as well.[145] Davis
was then discharged from the D&E program at Jester IV and cleared

---

[139]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 15 n.43.

[140]CMC MD/MLP Chart Review, Exhibit 16 to Adams Affidavit,
Docket Entry No. 81-4, p. 23.

[141]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 15 n.44.

[142]CMC Inpatient Nursing Progress Note, Exhibit 17 to Adams
Affidavit, Docket Entry No. 81-4, p. 28.

[143]Id.

[144]Email from Shirley Nelson, Hospital Galveston, to Dr. Philip
Farley, Exhibit B to Defendants' MSJ, Docket Entry No. 81, p. 154.

[145]CMC Mental Health Services, Exhibit 17 to Adams Affidavit,
Docket Entry No. 81-4, pp. 35-39.

to return to his unit of assignment.[146]  The clinician who made that determination noted that Davis admitted feigning and exaggerating mental health symptoms for secondary gain (e.g., to expedite medical care for his foot), but that Davis was aware that he did not have to "use extremes to meet [his] needs."[147]

On October 2, 2017, Davis had a short layover at the Darrington Unit on his way back to the Ramsey I Unit.[148]  Upon arrival at the Darrington Unit Davis tied a shoelace around his neck and threatened to commit suicide.[149]  Davis was seen by a mental health provider, who determined that he should be re-admitted to the Jester IV Unit for crisis management.[150]  On October 2, 2017, Davis was evaluated in the Darrington Unit clinic by Dr. Hulipas, who increased Davis's pain medication and cleared him to be transferred to the Jester IV Unit.[151]

---

[146]CMC Mental Health Services Inpatient Diagnostic & Evaluation Discharge Summary, Exhibit 17 to Adams Affidavit, Docket Entry No. 81-4, p. 42.

[147]Id.

[148]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 16.

[149]Id.

[150]CMC Outpatient Mental Health Services, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, pp. 66, 69.

[151]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 16; CMC Outpatient Mental Health Services, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, pp. 61, 63, 66, 69; CMC Urgent/Emergent Care Record, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, p. 48; Prescription issued by Dr. Hulipas, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, p. 55.

Later in the day on October 3, 2019, Davis was readmitted to the Jester IV Unit and evaluated by RN Mathew, who noted that Davis had an appointment to see an orthopedic specialist at the UTMB Hospital in Galveston on October 9, 2017.[152]   Davis was placed in crisis management for mental health monitoring.[153]

On October 6, 2019, Davis was discharged from crisis management and cleared to return to his unit of assignment.[154] During another layover at the Darrington Unit, however, Davis once again threatened to commit suicide.[155]   Davis was promptly referred for readmission to the Jester IV Unit for crisis management for his mental health needs.[156]   Later that day, Dr. Farley advised that Davis's appointment at the UTMB Orthopedic Clinic would need to be rescheduled due to Davis's status in crisis management at the Jester IV Unit.[157]

On October 12, 2019, Davis was discharged from crisis management and transferred directly to his unit of assignment at

[152]CMC Inpatient RN Assessment, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, p. 53.

[153]CMC Mental Health Services, Exhibit 19 to Adams Affidavit, Docket Entry No. 81-4, pp. 73-74; CMC Mental Health Services, Exhibit 19 to Adams Affidavit, Docket Entry No. 81-4, pp. 78-79.

[154]CMC Mental Health Services, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, p. 82.

[155]CMC Outpatient Mental Health Services, Exhibit 19 to Adams Affidavit, Docket Entry No. 81-4, p. 86.

[156]Id. at 88.

[157]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 17; Email Correspondence dated Oct. 6, 2017, Exhibit 19 to Adams Affidavit, Docket Entry No. 81-4, p. 90.

the Ramsey I Unit.[158]   Upon his arrival Davis once again expressed
suicidal ideations.[159]   After meeting with a mental health clinician
and the Ramsey I Unit Classification Committee, Davis was referred
for readmission to the Jester IV Unit for additional crisis
management.[160]

On October 13, 2017, Davis returned to the Jester IV Unit
where he was evaluated by RN Mathew.[161]   RN Mathew noted that Davis
had a fractured big toe and a prescription for pain medication.[162]
Davis was placed in crisis management for observation and
monitoring due to his suicidal behavior.[163]   He was seen in the
clinic, but refused to allow providers to buddy tape his fractured
toe.[164]   When Davis demanded that his foot be wrapped instead with
thick padding, Dr. Nguyen repeated the order for buddy taping.[165]

---

[158]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 17.

[159]CMC Medical and Mental Health Transfer Screen, Parts III &
IV, Exhibit 20 to Adams Affidavit, Docket Entry No. 81-4, p. 130.

[160]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, pp. 17-18; CMC Outpatient Mental Health Services,
Exhibit 20 to Adams Affidavit, Docket Entry No. 81-4, p. 137.

[161]Inpatient RN Assessment, Exhibit 21 to Adams Affidavit,
Docket Entry No. 81-4, p. 142.

[162]Id.

[163]CMC Mental Health Services, Exhibit 21 to Adams Affidavit,
Docket Entry No. 81-4, pp. 143-46.

[164]TDCJ-Institutional Division-Health Services, Refusal of
Treatment or Services, Exhibit 21 to Adams Affidavit, Docket Entry
No. 81-4, p. 147.

[165]Email Correspondence dated Oct. 16, 2017, Exhibit 21 to
Adams Affidavit, Docket Entry No. 81-4, p. 148; CMC Inpatient
(continued...)

-33-

Davis remained in crisis management until he was discharged on October 18, 2017.[166]   He returned to the Ramsey I Unit on October 19, 2017.[167]

On October 23, 2017, Davis was seen by an orthopedic specialist and a resident at the UTMB Hospital for his complaints of foot pain.[168]  After reviewing the images taken of Davis's right foot, the doctors diagnosed a great toe distal phalanx fracture and a sprain in Davis's forefoot and midfoot.[169]   He was given a "[f]racture boot" to wear on his right foot with weight bearing as tolerated, Tylenol for pain, and a follow-up appointment in eight weeks.[170]

While at the Ramsey I Unit on October 24, 2017, Davis was again referred for readmission to crisis management at the Jester IV Unit after he expressed suicidal and homicidal thoughts.[171]  Security personnel were told that Davis was allowed to

---

[165](...continued)
Nursing Progress Note, Exhibit 21 to Adams Affidavit, Docket Entry No. 81-4, p. 149.

[166]CMC Mental Health Services, Exhibit 21 to Adams Affidavit, Docket Entry No. 81-4, p. 161.

[167]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 19.

[168]Office Visit with Dr. Mark Foreman, Exhibit 23 to Adams Affidavit, Docket Entry No. 81-4, pp. 178-80.

[169]Id. at 180.

[170]Id.; CMC HG Offender Medical Pass, Exhibit 23 to Adams Affidavit, Docket Entry No. 81-4, p. 182.

[171]CMC Outpatient Mental Health Services, Exhibit 23 to Adams Affidavit, Docket Entry No. 81-4, pp. 186-87.

keep his fracture boot, which was to remain on his foot at all times until his next appointment with the orthopedic specialist.[172] Davis was discharged from crisis management and cleared to return to his unit of assignment on October 30, 2017.[173]

On November 15, 2017, Davis was assigned to the Polunsky Unit.[174]  On December 13, 2017, Davis was taken to the clinic with a new injury to his right foot.[175]  Davis told the provider that he fell to the ground while trying to put on his boxer shorts without putting weight on his right foot, which was in the fracture boot.[176] New x-rays were taken of Davis's right foot.[177]  The radiologists who reviewed the x-rays determined that all previously noted tissue swelling was resolved and that there was no bony abnormality or fracture, but that Davis had developed "moderate periarticular osteopenia" in his right ankle and foot.[178]  Dr. Adams explains that

---

[172]CMC Clinic Notes-Nursing, Exhibit 23 to Adams Affidavit, Docket Entry No. 81-4, p. 189.

[173]CMC Mental Health Services, Exhibit 23 to Adams Affidavit, Docket Entry No. 81-4, p. 195.

[174]CMC Medical and Mental Health Transfer Screening Parts III & IV, Exhibit 24 to Adams Affidavit, Docket Entry No. 81-4, p. 200.

[175]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 20.

[176]CMHC Urgent/Emergent Care Record, Exhibit 24 to Adams Affidavit, Docket Entry No. 81-4, p. 208.

[177]Id. at 208, 210.

[178]CMHC Radiology Report, Exhibit 24 to Adams Affidavit, Docket Entry No. 81-4, p. 211.

osteopenia is a loss of bone density that can occur as the result of immobility and a lack of weight bearing, which can also cause atrophy.[179]  On December 14, 2017, Davis was treated in the Polunsky Unit clinic by PA Reilley, who spoke to him about weight bearing as tolerated for his foot and noted that he had an upcoming follow-up appointment with an orthopedic specialist.[180]

On December 21, 2017, Davis returned for his follow-up appointment at the UTMB Hospital in Galveston, where he was evaluated in the Orthopedic Clinic.[181]   The treatment provider observed that Davis's fractured toe had healed, but that his foot had developed "disuse/generalized atrophy and osteopenia [without] any other intrinsic pathology or instability."[182]   The orthopedic specialist ordered Davis to be weaned out of the fracture boot over the next four weeks and recommended medical boots for both feet to provide support.[183]

At some point Davis returned to the Jester IV Unit where he was seen by Dr. Nguyen on January 16, 2018.[184]   Dr. Nguyen observed

---

[179]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 20, n.66.

[180]CMHC Clinic Notes, Exhibit 24 to Adams Affidavit, Docket Entry No. 81-4, p. 214.

[181]Office Visit-TDCJ Ortho Clinic, Exhibit 24 to Adams Affidavit, Docket Entry No. 81-4, pp. 215-18.

[182]Id. at 216.

[183]Id. at 217.

[184]CMHC Clinic Notes, Exhibit 25 to Adams Affidavit, Docket Entry No. 81-4, pp. 220-22.

that Davis was still wearing the fracture boot and that he reported having a "physical disability" due to his fractured toe.[185]  After reviewing records of orthopedic specialist's recent evaluation, Dr. Nguyen discontinued the fracture boot and prescribed a calcium supplement to treat Davis's osteopenia.[186]

On January 29, 2018, Dr. Nguyen issued a temporary walker pass after Davis complained that the fracture boot was discontinued too soon.[187]  The walker pass was discontinued shortly thereafter on January 31, 2018, when prison officials observed Davis "ambulating normally absent the walker without difficulty or evidence of discomfort."[188]  Other than his mental health and behavioral issues, Dr. Adams reports that Davis is currently healthy and has no significant chronic medical issues or disability.[189]

### 2. Claims of Conspiracy

Davis's primary claim is that all of the individual defendants conspired to deprive him of adequate medical care for the purpose of covering up the injury he sustained when an officer stepped on

---

[185]Id. at 220.

[186]Id. at 221-22.

[187]CMHC Inpatient Nursing Progress Note, Exhibit 25 to Adams Affidavit, Docket Entry No. 81-4, p. 223; Email Correspondence dated Jan. 29, 2018, Exhibit 25 to Adams Affidavit, Docket Entry No. 81-4, p. 225.

[188]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, pp. 21-22 (citing Exhibit 25 to Adams Affidavit, Nursing Progress Notes x2, Email by Dr. Nguyen, and Psychiatric Follow-Up Note by Dr. Patel dated January 28-30, 2018).

[189]Id. at 4.

his foot on September 4, 2017.[190]  In support of that claim, Davis alleges that officials employed by UTMB and TDCJ "worked together as a gang/organization" to deny him care so that they could prevent a civil rights lawsuit.[191]

To establish an actionable claim of conspiracy under 42 U.S.C. § 1983 a plaintiff must show that the defendants agreed to commit an illegal act that violated the plaintiff's civil rights.  See Arsenaux v. Roberts, 726 F.2d 1022, 1024 (5th Cir. 1982); see also McKinney v. McDuffie, 789 F. App'x 413, 416 (5th Cir. 2019) (per curiam).  A plaintiff asserting a civil conspiracy claim under § 1983 must plead "'operative facts'" showing a prior illegal agreement; "'bald allegations'" of an agreement do not suffice. Way v. Mueller Brass Co., 840 F.2d 303, 308 (5th Cir. 1988) (citations omitted); see also Wilson v. Budney, 976 F.2d 957, 958 (5th Cir. 1992) (per curiam) (holding that allegations of conspiracy that are "merely conclusional" will not support an action under 42 U.S.C. § 1983); Bowen v. Quarterman, 339 F. App'x 479, 482 (5th Cir. 2009) (per curiam) (concluding that a prisoner's bare allegation that it was reasonable to believe that the defendants were part of a conspiracy, without any facts that tended to show an agreement between them, was insufficient to state a viable conspiracy claim) (citing Hale v. Harney, 786 F.2d 688, 690 (5th Cir. 1986)).

---

[190]Amended Complaint, Docket Entry No. 53, pp. 1-2 ¶¶ 1-3; Plaintiff's Response, Docket Entry No. 93, pp. 6-7 ¶ 10.

[191]Plaintiff's Response, Docket Entry No. 93, p. 6 ¶ 10.

Davis has not alleged specific facts showing that there was an actual agreement among the named defendants or any other prison officials to deprive him of proper medical care. Under these circumstances, Davis has failed to state an actionable claim for conspiracy against any of the defendants. See McAfee v. 5th Circuit Judges, 884 F.2d 221, 222 (5th Cir. 1989) ("It is now well settled in this Circuit that 'mere conclusory allegations of conspiracy cannot, absent reference to material facts,' state a substantial claim of federal conspiracy.") (quoting Brinkmann v. Johnston, 793 F.2d 111, 113 (5th Cir. 1986)). Accordingly, the defendants are entitled to summary judgment on this claim.

3. Claims Against LVN Wise

The medical records reflect that LVN Wise treated Davis shortly after his altercation with another inmate on September 4, 2017, which resulted in a use of force by officers.[192] Davis alleges that he told Wise that his foot hurt from being stepped on,[193] but the records show that Wise observed "no visible injuries."[194] Davis alleges further that LVN Wise refused to send him to the hospital on September 8, 2017.[195]

_____

[192]CMC Use of Force Nursing Note, Exhibit 4 to Adams Affidavit, Docket Entry No. 81-3, p. 91.

[193]Amended Complaint, Docket Entry No. 53, p. 1 ¶ 1.

[194]CMC Use of Force Nursing Note, Exhibit 4 to Adams Affidavit, Docket Entry No. 81-3, p. 91.

[195]Amended Complaint, Docket Entry No. 53, p. 2 ¶ 4.

Davis argues that he told LVN Wise that his foot hurt on September 4, 2017, but that Wise ignored his complaints of pain because UTMB employees are trained to cover up for officers when an inmate is injured to avoid a civil rights lawsuit.[196]  Dr. Adams denies that such a training program exists, noting in her affidavit that UTMB is an independent contractor that provides health services for state inmates.[197]  As such, UTMB employees are medical professionals who provide care in a correctional setting, but they are employed by UTMB, and not TDCJ.[198]  According to Dr. Adams, there are multiple levels of supervision and review to ensure that prisoners receive care that meets community and national standards.[199]  Davis presents no evidence that medical providers employed by UTMB are trained to ignore injuries to prisoners, and he does not otherwise allege facts showing that such a training program exists.

More importantly, assuming that Davis's allegation is true and that he told Wise that his foot hurt from being stepped on during the use of force that occurred on September 4, 2017, his allegation is insufficient to state a constitutional violation.  Davis does not allege facts showing that LVN Wise knew that he had a serious foot

---

[196]Id. at 1 ¶ 1.

[197]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 22 & n.76.

[198]Id.

[199]Id.

injury as the result of being stepped on by an officer, but disregarded an excessive risk to his health with the requisite deliberate indifference.  See Farmer, 114 S. Ct. at 1979.  In addition, although Davis alleges that he was also denied care by LVN Wise on September 8, 2017, the medical records reflect that Davis was treated by other providers on that occasion and that Wise was not involved.[200]  Because Davis does not demonstrate that LVN Wise denied him care for a serious injury in violation of the Eighth Amendment, Wise is entitled to summary judgment on this claim.

### 4.  Claims Against RN Persinger

Davis alleges that RN Persinger violated his rights on September 6, 2017, when she "down played" the injury to his foot, which was discolored and swollen from being stepped on by an officer on September 4, 2017.[201]  The medical records show that Davis was examined in the clinic by Persinger and another nurse (LVN Patricia Burnett), who noted that Davis's right ankle was "slightly swollen."[202]  Davis was given acetaminophen for pain and was scheduled to see a provider that same day.[203]  He was also instructed to keep his foot elevated and to limit his physical

---

[200]CMC Pre-Crisis Management Health Evaluation, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, pp. 128-31; CMC Nursing Protocol for Psychiatric Symptoms, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, pp. 132-38.

[201]Amended Complaint, Docket Entry No. 53, p. 1 ¶ 2.

[202]CMC Nursing Protocol for Musculoskeletal Symptoms, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 109.

[203]Id. at 110-11.

activity.[204]  According to Dr. Adams, Davis was treated appropriately by RN Persinger, whose actions were "medically correct."[205]

The record confirms that Davis was seen by a provider (PA Reilley) on September 6, 2017, who ordered x-rays of Davis's injured foot and ankle.[206]  There is no evidence that RN Persinger denied Davis treatment, ignored his complaints, knowingly treated him incorrectly, or acted with wanton disregard for a serious medical need.  See Gobert, 463 F.3d at 346.  Because Davis does not demonstrate that RN Persinger acted with deliberate indifference, she is entitled to summary judgment on the claims against her.

### 5.   Claims Against PA Reilley

Davis alleges that PA Reilley violated his rights when he saw him at the Polunsky Unit clinic on September 6, 2017, because after taking x-rays of Davis's injured foot Reilley asked Davis "what happened" instead of telling him what was wrong.[207]  Davis appears to claim that PA Reilley purposely concluded that his foot was not fractured in an attempt to cover up "for the officer [who stepped on his foot] and UTMB" because he was not treated in a timely fashion.[208]

---

[204]Id. at 110.

[205]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 5.

[206]CMC Clinic Notes-Nursing, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 112.

[207]Amended Complaint, Docket Entry No. 53, p. 2 ¶ 3.

[208]Id.

The medical records show that PA Reilley saw Davis in the clinic on September 6, 2017, and ordered x-rays of his right foot.[209]  Two radiologists reviewed the x-rays and reported that there was no fracture or dislocation and that the soft tissues were "unremarkable."[210]  After reviewing the radiologists' report PA Reilley diagnosed a foot contusion and ordered a pair of crutches with weight bearing as tolerated.[211]  He also ordered NSAIDS for pain.[212]

Davis acknowledges that PA Reilley ordered x-rays of his injured foot and did not ignore his complaints of pain.[213] According to Dr. Adams, the "working diagnosis" of contusion and the treatment provided by PA Reilley was timely and medically appropriate based on the objective findings at the time.[214]  To the extent that Davis alleges that PA Reilley made an incorrect determination about his injury, he does not dispute that Reilley's

---

[209]CMC Clinic Notes-Nursing, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 112.

[210]CMC Radiology Report, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 119.

[211]CMC Addendum Note, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 116.

[212]Id.

[213]Amended Complaint, Docket Entry No. 53, p. 2 ¶ 3.

[214]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 6.

diagnosis was based on the radiologists' conclusion that there was no fracture shown in the x-rays of Davis's foot.[215]

The Supreme Court has recognized that whether a particular form of treatment is indicated "is a classic example of a matter for medical judgment." Estelle, 97 S. Ct. at 293. A prisoner's disagreement with a medical provider's assessment, absent exceptional circumstances, does not demonstrate deliberate indifference. Gobert, 463 F.3d at 346. Davis does not allege facts showing that exceptional circumstances are present here, and he does not show that PA Reilley ignored his complaints of pain or intentionally treated him incorrectly based on the radiologists' report. See id. Even if the diagnosis of contusion was mistaken, an incorrect diagnosis does not amount to a constitutional violation. See Domino, 239 F.3d at 756 (noting that "an incorrect diagnosis does not amount to deliberate indifference"). Davis does not show that PA Reilley acted with deliberate indifference or wanton disregard for his health. Therefore, PA Reilley is entitled to summary judgment on the claims against him.

### 6.   Failure to Call 911 on September 8, 2017

Davis alleges that when he arrived at the Jester IV Unit on September 8, 2017, he told RN M. Paningbatan that his foot was broken, but she would not call 911 to send him to the hospital

---

[215]CMC Radiology Report, Exhibit B to Defendants' MSJ, Docket Entry No. 81, p. 219.

without a doctor's authorization.[216]  Davis alleges that Dr. Farley,
Dr. Nguyen, and RN G. Paningbatan also refused to call 911 so that
he could go to the hospital.[217]

As noted above, Davis was sent to the Jester IV Unit for
mental health crisis management.[218]  The medical records show that
RN M. Paningbatan saw Davis for an intake examination and sent his
chart for review by a provider after noting that his toe was
swollen.[219]  Dr. Nguyen signed off on the intake examination, but
there is no indication that Dr. Farley was involved.[220]
RN G. Paningbatan saw Davis sometime after the intake examination
occurred and confirmed that his chart had been referred for a
medical appointment.[221]

Davis acknowledges that RN M. Paningbatan reviewed his chart
and forwarded it to a physician for an appointment, which was
scheduled for September 11, 2017.[222]  According to Dr. Adams, Davis

---

[216]Amended Complaint, Docket Entry No. 53, p. 2 ¶ 5.

[217]Id. at ¶¶ 5-6.

[218]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 7.

[219]CMC Inpatient RN Assessment, Exhibit 7 to Adams Affidavit,
Docket Entry No. 81-3, p. 140.

[220]Id. at 141.

[221]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 7; CMC Inpatient Nursing Progress Note, Exhibit 7 to
Adams Affidavit, Docket Entry No. 81-3, p. 149.

[222]Amended Complaint, Docket Entry No. 53, p. 2 ¶ 5.

remained in crisis management for his mental health issues from September 8, 2017, through September 12, 2017.[223] The medical records confirm that Davis was seen in the clinic by Dr. Nguyen on September 12, 2017, who ordered another x-ray of Davis's right foot.[224]

Dr. Adams explains that nurses and security personnel in TDCJ facilities can order a 911 transfer to an outside hospital, "but only when there is a life-threatening emergency and time does not permit contact with a provider (physician, physician assistant, or nurse practitioner)."[225] Noting that Davis had received x-rays and treatment from a medical provider, Dr. Adams states that Davis's foot injury was not an emergency and that a 911 transfer was not "medically indicated."[226]

The decision that Davis did not require an emergency 911 transfer to the hospital was based on an exercise of medical judgment. See Estelle, 97 S. Ct. at 293. Davis does not allege facts showing that a trip to an outside hospital emergency room was needed; and he does not otherwise demonstrate that RN M. Paningbatan, RN G. Paningbatan, Dr. Farley, or Dr. Nguyen was

---

[223]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 8.

[224]CMC Clinic Notes, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, p. 156.

[225]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 7.

[226]Id.

aware of a serious medical need, but disregarded an excessive risk to his health with deliberate indifference. See Farmer, 114 S. Ct. at 1979. Therefore, these defendants are entitled to summary judgment on Davis's claims against them stemming from the refusal to call 911 on September 8, 2017.

### 7. Additional Claims Against Dr. Nguyen

Davis alleges further that Dr. Nguyen refused to see him on September 11, 2017, because Davis was not "housed on [Dr. Nguyen's] unit."[227] Davis claims that Dr. Nguyen did not take his foot injury seriously and did not see him until the next day on September 12, 2017.[228]

Dr. Adams explains that during this time Dr. Nguyen was the Medical Director who provided medical care and supervision of other providers at four prison facilities that made up the "Jester Complex," which included the Jester IV Unit.[229] Dr. Adams notes that Davis's foot problems were not urgent, but did require follow-up care.[230] Based on the medical records, Dr. Adams concludes that Dr. Nguyen's decision to schedule an appointment for Davis on

---

[227]Amended Complaint, Docket Entry No. 53, p. 2 ¶ 6.

[228]Id.

[229]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, pp. 7-8 and n.18.

[230]Id. at 8.

-47-

September 12, 2017, was timely and appropriate.[231]

Medical records confirm that Davis was seen on September 9, 2017, and September 10, 2017, by nursing staff who observed that he was standing in his cell, that he had pain medication as well as a referral to be seen by a medical provider, and that he was in no apparent distress.[232]  On September 11, 2017, Dr. Nguyen reviewed the nurses' notes and scheduled an appointment for Davis the following day.[233]  When Dr. Nguyen saw Davis on September 12, 2017, he ordered additional x-rays.[234]  Those x-rays were completed by PA Faust at the Huntsville Unit on September 13, 2017,[235] after Davis was discharged from crisis management and cleared to return to his unit of assignment.[236]

Dr. Nguyen's decision that Davis could wait to be seen until September 12, 2017, involved a medical determination that his

---

[231]Id.

[232]CMC Inpatient Nursing Progress Note, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, p. 150; CMC Inpatient Nursing Progress Note, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, p. 151.

[233]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 7; Email Correspondence dated Sept. 11, 2017, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, p. 155.

[234]CMC Clinic Notes, Exhibit 7 to Adams Affidavit, Docket Entry No. 81-3, p. 156.

[235]CMC Radiology Report, Exhibit 8 to Adams Affidavit, Docket Entry No. 81-3, p. 164.

[236]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 9.

condition was not urgent.  See Estelle, 97 S. Ct. at 293.  Davis does not show that Dr. Nguyen disregarded an excessive risk to his health when delaying his appointment by one day.  Likewise, as discussed further below, Davis does not show that he suffered substantial harm as a result of any delay in treatment.  Therefore, Dr. Nguyen is entitled to summary judgment on Davis's claim that he was denied adequate medical care on September 11, 2017.

### 8.   Claims Against PA Faust, Dr. Calles, and Dr. Stedman

Davis claims that when x-rays were taken at the Huntsville Unit on September 13, 2017, PA Faust and the radiologists who reviewed those x-rays (Dr. Calles and Dr. Stedman) wrongly found that there was no fracture to cover up the fact that his foot was broken when an officer stepped on it on September 4, 2017.[237]  As a result, Davis contends that these defendants denied him adequate medical care.[238]

The medical records confirm that Davis was seen at the Huntsville Unit when he arrived on September 13, 2017, and that PA Faust ordered x-rays for his right foot.[239]   Dr. Calles and Dr. Stedman reviewed the x-rays and concluded that there was no

---

[237]Amended Complaint, Docket Entry No. 53, p. 3 ¶ 8.

[238]Id.

[239]CMC Nursing Protocol for Musculoskeletal Symptoms, Exhibit 8 to Adams Affidavit, Docket Entry No. 81-3, p. 170.

acute fracture or dislocation.[240]   Davis was treated with pain medication and given crutches along with a bottom-bunk assignment.[241]   PA Faust also scheduled him to see a provider once he arrived at his unit of assignment.[242]

Davis does not show that his complaints of pain were ignored or that he was denied medical care by the medical professionals who treated him at the Huntsville Unit on September 13, 2017.   The determination that Davis's x-rays showed no fracture and did not require treatment beyond pain medication, crutches, and a bottom-bunk assignment was based on medical judgment.   See Estelle, 97 S. Ct. at 293.   Davis's disagreement with that determination does not demonstrate deliberate indifference or rise to the level of a constitutional violation.   Gobert, 463 F.3d at 346.   Davis does not otherwise show that PA Faust, Dr. Calles, or Dr. Stedman denied him adequate medical care in violation of the Eighth Amendment. Therefore, these defendants are entitled to summary judgment on the claims against them.

### 9.   Claims Against Dr. Geddes and LVN Madl

Davis alleges that he had a lay-in appointment to see

---

[240]CMC Radiology Report, Exhibit 8 to Adams Affidavit, Docket Entry No. 81-3, p. 164.

[241]CMC Nursing Protocol for Musculoskeletal Symptoms, Exhibit 8 to Adams Affidavit, Docket Entry No. 81-3, p. 170.

[242]Id. at 170-171; CMC Reminder Import Log, Exhibit 9 to Adams Affidavit, Docket Entry No. 81-3, p. 179.

Dr. Geddes when he returned to the Polunsky Unit on September 14, 2017, following the x-rays that were taken at the Huntsville Unit, but was told by LVN Madl that he would not be seen by a provider or treated for his foot injury until he returned to his unit of assignment (the Ramsey I Unit) on September 16, 2017.[243] According to Dr. Adams, the medical records show that Davis did not have an appointment with Dr. Geddes on September 14, 2017.[244]  The record contains only a "reminder" from the Huntsville Unit that a follow-up appointment was needed.[245]

The medical records show that LVN Madl examined Davis when he arrived from the Huntsville Unit.[246]   Madl observed no cuts, bruises, sores, or physical deformities.[247]  Davis's only complaint during the examination concerned an appointment for dental care.[248] Davis was escorted to the dental department, where his appointment was rescheduled.[249]  The medical records show that Dr. Geddes signed

---

[243]Amended Complaint, Docket Entry No. 53, p. 3 ¶ 9.

[244]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 10.

[245]Id. at 10 & n.26; CMC Reminder Import Log, Exhibit 9 to Adams Affidavit, Docket Entry No. 81-3, p. 179.

[246]CMC Medical and Mental Health Transfer Screen, Parts III & IV, Exhibit 9 to Adams Affidavit, Docket Entry No. 81-3, pp. 175, 178.

[247]Id. at 175.

[248]Id.

[249]Id.

off on Madl's examination, but there is no indication that he saw Davis on September 14, 2017, or that he was involved in any other way.[250]

"Personal involvement is an essential element of a [42 U.S.C. § 1983] cause of action." <u>Thompson v. Steele</u>, 709 F.2d 381, 382 (5th Cir. 1983).  Accordingly, "[t]he plaintiff 'must establish that the defendant was either personally involved in the deprivation [of his constitutional rights] or that his wrongful actions were causally connected to the deprivation.'" <u>Spence v. Nelson,</u> 603 F. App'x 250, 255 (5th Cir. 2015) (per curiam) (unpublished) (quoting <u>Jones,</u> 678 F.3d at 349)).  There is no evidence that Dr. Geddes treated Davis on September 14, 2017, or that he had any personal involvement with the care that Davis received that day.  As a result, Dr. Geddes is entitled to summary judgment on the claims against him.

Likewise, there is no evidence in the record showing that Madl was aware of a serious risk to Davis's health when she examined him on September 14, 2017, or that she deliberately ignored such a risk when she advised him that he would be seen by a provider at his unit of assignment on September 16, 2017.  As a result, Davis has failed to show that LVN Madl denied him adequate medical care in violation of his constitutional rights or that she is liable under 42 U.S.C. § 1983.  Accordingly, Davis's claims against LVN Madl

---

[250]<u>Id.</u> at 178.

will be dismissed.[251]

### 10. Claims Against PA Kuyinu

Davis alleges that PA Kuyinu denied him adequate medical care when he was treated at the Stringfellow Unit following his transfer to the Ramsey I Unit on September 16, 2017.[252] Davis alleges that Kuyinu declined to send Davis to the hospital without doing his own assessment.[253]

Dr. Adams acknowledges that PA Kuyinu did not personally examine Davis on September 16, 2017.[254] Dr. Adams explains that Kuyinu was "on call" and was not present at the Stringfellow Unit

---

[251]The Attorney General's Office has not filed an answer on behalf of LVN Madl because she is reportedly employed by a private entity, and not UTMB. See Defendants' Original Answer and Jury Demand, Docket Entry No. 62, p. 1 n.1. The Attorney General's Office has provided no other information about Madl's employment, and she has not been served. To the extent that the other defendants have shown that Davis was not denied constitutionally adequate care, the Fifth Circuit has recognized that when one defending party establishes that the plaintiff has no cause of action, this defense generally inures also to the benefit of other similarly situated defendants. See Lewis v. Lynn, 236 F.3d 766, 768 (5th Cir. 2001) (quoting United States v. Peerless Ins. Co., 374 F.2d 942, 945 (4th Cir. 1967) (citations omitted)). Because the record does not demonstrate that LVN Madl denied Davis care, the court will dismiss the claims against her pursuant to 28 U.S.C. § 1915(e)(2)(B).

[252]Amended Complaint, Docket Entry No. 53, p. 3 ¶ 10.

[253]Id. at 3-4 ¶ 10.

[254]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 10.

when Davis was escorted there from the Ramsey I Unit.[255]  PA Kuyinu relied on information provided by the nurse who examined Davis.[256] According to Dr. Adams, this is a common practice in both community and correctional medicine for after-hours complaints that are not an emergency.[257]  The medical records confirm that Davis was treated by a nurse at the Stringfellow Unit on September 16, 2017, who provided him with pain medication and scheduled him to see a unit provider.[258]  Dr. Adams notes that Davis was treated appropriately with pain medication as well as a follow-up appointment with a medical provider during regular clinic hours and that his condition did not warrant transfer to a hospital.[259]

The medical records reflect that Davis was scheduled to see a provider at PA Kuyinu's request and that an appointment was scheduled for September 18, 2017.[260]  However, Davis was transferred back to the Jester IV Unit for crisis management following another

---

[255]Id.

[256]Id.

[257]Id.

[258]Nurse Triage Form, Exhibit 10 to Adams Affidavit, Docket Entry No. 81-3, p. 187.

[259]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 10.

[260]CMC Return to Clinic Pass, Exhibit 10 to Adams Affidavit, Docket Entry No. 81-3, p. 189; CMC Reminder Import Log, Exhibit 11 to Adams Affidavit, Docket Entry No. 81-3, p. 192.

threat of self-harm before that appointment could occur.[261]  As a result, Davis missed the appointment that was scheduled for him through no fault of PA Kuyinu.

The records show that PA Kuyinu considered the information available to him and determined that Davis's condition was not life-threatening, which was a medical decision.  See Estelle, 97 S. Ct. at 293.  Davis does not show that PA Kuyinu knowingly treated him incorrectly based on the information that was available to him or acted with wanton disregard for a serious medical need. See Gobert, 463 F.3d at 346.  Absent a showing that PA Kuyinu was aware of but deliberately ignored an excessive risk to his health, Davis does not demonstrate that he was denied care with the requisite deliberate indifference.  See Farmer, 114 S. Ct. at 1979. Accordingly, PA Kuyinu is entitled to summary judgment on the claims against him.

### 11.  Claims Against LVN Powell

Davis alleges that LVN Powell violated his rights at the Ramsey I Unit on September 17, 2017, when she told him that she would not send him to the hospital because his chart said there was no fracture in his foot.[262]  Dr. Adams notes that Davis was not seen on September 17, 2017, because he had an appointment for

---

[261]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 11 (citing Exhibit 11, CMC Outpatient Mental Health Services, Docket Entry No. 81-3, pp. 195-96).

[262]Amended Complaint, Docket Entry No. 53, p. 4 ¶ 11.

September 18, 2017.[263]  As noted above, the scheduled appointment
did not occur.  Instead, the medical records show that LVN Powell
saw Davis on September 18, 2017, following a suicidal gesture that
resulted in a use of force by officers.[264]  During this encounter
Davis complained of a rash from a chemical agent.[265]  Davis was then
seen by a mental health clinician, who determined that Davis needed
crisis management for his threats of self-harm.[266]  Although the
records show that Davis told the mental health clinician that his
foot was broken and that he needed to go to the hospital, the
clinician ordered Davis to be placed under supervision until he
could be transported to the Jester IV Unit.[267]

The medical records do not indicate that Davis told LVN Powell
that his foot was injured during the evaluation that took place
following the use of force on September 18, 2017.[268]  Even assuming
that Davis's allegation is true and that LVN Powell declined to
send him to the hospital after looking at his chart, Davis does not
allege facts showing that she improperly relied on his chart or

---

[263]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 11.

[264]Id. (citing Exhibit 11, CMC Use of Force Nursing Note,
Docket Entry No. 81-3, p. 193).

[265]Id.

[266]Id. (citing Exhibit 11, CMC Outpatient Mental Health
Services, Docket Entry No, 81-3, pp. 195-96).

[267]Id. at 196.

[268]CMC Use of Force Nursing Note, Exhibit 11 to Adams
Affidavit, Docket Entry No. 81-3, p. 193.

that his transfer to a hospital was warranted by a medical emergency. The clinician who evaluated Davis that same day also declined to send him to the hospital and concluded instead that Davis required a transfer to the Jester IV Unit due to his suicidal behavior.[269] Under the circumstances, Davis does not establish that LVN Powell intentionally treated him incorrectly or that she was aware of but was deliberately indifferent to an excessive risk to his health. See Farmer, 114 S. Ct. at 1979. Therefore, LVN Powell is entitled to summary judgment on the claims against her.

### 12. Claims Against RN Mathew

Davis alleges that he told RN Mathew that his foot was broken when he returned to the Jester IV Unit on September 20, 2017, but that she would not send him to the hospital without a doctor's authorization.[270] The record shows that RN Mathew noted that Davis's foot had moderate swelling.[271] RN Mathew sent Davis's chart to Dr. Nguyen, who scheduled Davis for a lay-in appointment the next day.[272]

Dr. Adams notes that although Davis complained of being in pain, his compliance with the pain medication that had been

---

[269]CMC Outpatient Mental Health Services, Exhibit 11 to Adams Affidavit, Docket Entry No. 81-3, pp. 195-96.

[270]Amended Complaint, Docket Entry No. 53, p. 4 ¶ 12.

[271]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 11 (citing Exhibit 12, CMC Inpatient RN Assessment, Docket Entry No. 81-3, p. 208).

[272]Id. (citing Exhibit 12 to Adams Affidavit, Email Correspondence dated Sept. 20, 2017, Docket Entry No. 81-3, p. 209).

prescribed to him during this time was documented at only 50.00%.[273] According to Dr. Adams, RN Mathew's actions in notifying Dr. Nguyen were medically appropriate and that transfer to a hospital emergency room was not warranted.[274]

Davis does not allege facts showing that his medical condition amounted to an emergency on September 20, 2017, and the record confirms that Dr. Nguyen scheduled an appointment to see him the next day.[275] Davis does not show that he was denied adequate medical care or that RN Mathew was aware of, but disregarded, an excessive risk to his health with the requisite deliberate indifference. See Farmer, 114 S. Ct. at 1979. Therefore, RN Mathew is entitled to summary judgment on Davis's claims against her.[276]

---

[273]Id. at 12 (citing Exhibit 12, CMC Mental Health Services - Mental Health Inpatient Nursing Assessment, current medication list dated September 20, 2017, Docket Entry No. 81-3, p. 204).

[274]Id. at 12.

[275]Id. at 11 (citing Exhibit 12 to Adams Affidavit, Email Correspondence dated Sept. 20, 2017, Docket Entry No. 81-3, p. 209).

[276]Davis also alleges that RN Mathew refused to send him to the hospital when he was at the Jester IV Unit on October 3, 2017. See Amended Complaint, Docket Entry No. 53, p. 5 ¶ 18. The medical records reflect that RN Mathew saw Davis that day while he was being readmitted for crisis management. See CMC Inpatient RN Assessment, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, pp. 51-53. However, there is no indication that he required a trip to the emergency room to treat his injured toe. Therefore, this claim is without merit.

13.  <u>Claims Against Dr. Friedman</u>

On September 21, 2017, Davis was treated by Dr. Nguyen, who ordered a CT scan of Davis's foot to rule out a Lisfranc injury that may have been undetected by his previous x-rays.[277] Davis acknowledges that this procedure was scheduled for September 28, 2017.[278]  Davis alleges that he demanded to go to the hospital on September 24, 2017, because he was in a great deal of pain, but that Dr. Friedman refused to see him.[279]

Dr. Adams notes that nursing staff contacted Dr. Friedman, who was the provider on call, about Davis's demands on September 24, 2017, and Dr. Friedman declined to intervene.[280]  Instead, Dr. Friedman advised nursing staff to notify Dr. Nguyen and follow up the next day on September 25, 2017.[281]

According to the medical records referenced by Dr. Adams, the nurse who treated Davis on September 24, 2017, noted that he was

---

[277]CMC Clinic Notes, Exhibit 13 to Adams Affidavit, Docket Entry No. 81-3, p. 229; UTMB CMC Health Service Referral Request, Exhibit 13 to Adams Affidavit, Docket Entry No. 81-3, p. 231.

[278]Amended Complaint, Docket Entry No. 53, p. 4 ¶ 13.

[279]<u>Id.</u> ¶ 14.

[280]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry 81-3, p. 13.

[281]<u>Id.</u>

angry and demanding.[282]  The nurse observed that Davis complained of pain, but he had an appointment with a specialist the following week and he had refused his morning dose of medication.[283]   The nurse notified the provider on call (Dr. Friedman), who advised her to follow up with Dr. Nguyen.[284]   Because of Davis's behavior, seclusion was considered as an option if he continued to act out.[285]  Dr. Adams explains that seclusion is "involuntary confinement alone in a room or area for management of violent or self-destructive behavior."[286]  She adds that "[i]n TDCJ, mental health seclusion is a safety measure utilized for limited amounts of time with clear instructions to the patient of the unacceptable behaviors that must cease for release from seclusion."[287]

The record shows that Dr. Friedman was advised about Davis's demands on September 24, 2017, and determined that he could wait to be seen by Dr. Nguyen, who had treated Davis previously.[288]  Dr. Friedman's decision that Davis's condition did not warrant

---

[282]CMC Inpatient Nursing Progress Note, Exhibit 14 to Adams Affidavit, Docket Entry No. 81-3, p. 241.

[283]Id.

[284]Id. at 243.

[285]Id.

[286]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, pp. 13-14 and n.39.

[287]Id. n.39.

[288]CMC Inpatient Nursing Progress Note, Exhibit 14 to Adams Affidavit, Docket Entry No. 81-3, pp. 241, 243.

transfer to the hospital, which was based on the information provided by the nurse who examined Davis, involved a matter of medical judgment that does not amount to deliberate indifference. See Estelle, 97 S. Ct. at 293. Absent a showing that Dr. Friedman was aware of but deliberately ignored an excessive risk to his health, Davis does not demonstrate that he was denied care in violation of his constitutional rights. See Farmer, 114 S. Ct. at 1979. Accordingly, Dr. Friedman is entitled to summary judgment on the claims against him.

14.  Claims Against Dr. Hulipas

Davis contends that Dr. Hulipas denied him adequate medical care by refusing to send him to the hospital after his fractured toe was diagnosed by the CT scan on September 28, 2017.[289]  Instead, Dr. Hulipas sent Davis back to the Jester IV Unit on October 3, 2017.[290]

The medical records show that on October 2, 2017, Davis was referred for readmission to the Jester IV Unit by a mental health provider, not Dr. Hulipas, after it was determined that Davis required crisis management for engaging in suicidal behavior.[291] Dr. Adams notes that the decision to refer Davis for crisis

---

[289]Amended Complaint, Docket Entry No. 53, p. 5 ¶ 17.

[290]Id.

[291]CMC Outpatient Mental Health Services, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, pp. 66, 69.

management was appropriate to prevent harm to Davis and others.[292] In Dr. Adams' opinion, Davis's foot injury did not warrant a trip to the emergency room or admission to a hospital.[293]

The medical records confirm that Dr. Hulipas evaluated Davis in the Darrington Unit clinic and cleared him to be transferred to the Jester IV Unit with a prescription for pain medication.[294] Davis does not show that Dr. Hulipas refused to treat him, knowingly treated him incorrectly, or displayed a wanton disregard for his medical needs.  See Gobert, 463 F.3d at 346.  To the extent that providers at the Darrington Unit exercised medical judgment when transferring Davis to the Jester IV Unit for mental health reasons, a determination based on medical judgment does not implicate a constitutional violation.  See Estelle, 97 S. Ct. at 293.  Therefore, Dr. Hulipas is entitled to summary judgment on the claims against him.

### 15.  Claims Against RN Baquero

Davis alleges that he was denied adequate medical care by RN Baquero because she refused to send him to the hospital before

---

[292]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 16.

[293]Id.

[294]CMC Urgent/Emergent Care Record, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, p. 48; Prescription issued by Dr. Hulipas, Exhibit 18 to Adams Affidavit, Docket Entry No. 81-4, p. 55.

he left the Jester IV Unit on October 20, 2017.[295]  The medical
records do not support Davis's claim because they do not show that
he was at the Jester IV Unit or seen by RN Baquero on October 20,
2017.

Dr. Adams notes that Davis was discharged from crisis
management and cleared to return to his unit of assignment on
October 18, 2019.[296]  The medical records reflect that Davis arrived
at the Ramsey I Unit on October 19, 2017, where he was treated by
mental health providers, but refused a "chain in" medical
evaluation.[297]  When Davis had a follow-up visit with a mental
health clinician on October 20, 2017, he made no mention of his
injured foot and only expressed concerns about completing an
educational program.[298]

Dr. Adams notes that RN Baquero saw Davis briefly during
rounds at the Jester IV Unit on October 10, 2017, but that she did
not see him on October 20, 2017.[299]  The medical records reflect

_____

[295]Amended Complaint, Docket Entry No. 53, p. 5 ¶ 20.

[296]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 19.

[297]CMC Outpatient Mental Health Services, Exhibit 22 to Adams
Affidavit, Docket Entry No. 81-4, pp. 163-65; CMC Medical and
Mental Health Transfer Screening, Parts III & IV, Exhibit 22 to
Adams Affidavit, Docket Entry No. 81-4, p. 167.

[298]CMC Outpatient Mental Health Services, Exhibit 22 to Adams
Affidavit, Docket Entry No. 81-4, p. 172.

[299]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry
No. 81-3, p. 19.

that RN Baquero saw Davis during "Seclusion Rounds" on October 10, 2017, but that he was sleeping and did not speak to her.[300]   Davis does not allege facts showing that he was denied medical care by RN Baquero on that occasion.   There is no indication in the records that Davis's foot injury required emergency treatment at a hospital or that he was denied adequate care with deliberate indifference by RN Baquero or any other defendant during this time.   Accordingly, RN Baquero is entitled to summary judgment on the claims against her.

## C.   Claims of Delay in Receiving Proper Care

Davis alleges that his rights were violated because there was substantial delay between the time his foot was injured on September 4, 2017, and the time he received a CT scan on September 28, 2017, followed by treatment with a fracture boot on October 23, 2017.[301]   Davis appears to blame PA Reilley for making the wrongful diagnosis of contusion when he reviewed the initial x-rays of his injured foot on September 6, 2017, which delayed the CT scan because other medical providers relied on Davis's chart

---

[300]CMC Inpatient Nursing Progress Note, Exhibit 20 to Adams Affidavit, Docket Entry No. 81-4, p. 127.   Davis was in seclusion because he overdosed on medication that he received from another inmate while in the shower.   See CMC Mental Health Services, Exhibit 20 to Adams Affidavit, Docket Entry No. 81-4, p. 117.

[301]Amended Complaint, Docket Entry No. 53, p. 5 ¶¶ 15-20; Plaintiff's Second MSJ, Docket Entry No. 90, p. 2.

when denying his requests to go to the hospital.[302]

Allegations of delay in receiving medical care only violate the Constitution "if there has been deliberate indifference that *results in substantial harm.*" <u>Rogers v. Boatright,</u> 709 F.3d 403, 410 (5th Cir. 2013) (emphasis in original) (quoting <u>Easter v. Powell,</u> 467 F.3d 459, 464 (5th Cir. 2006)).  A plaintiff alleging wrongful delay of medical care must also show that the defendants had a sufficiently culpable state of mind.  <u>See Mendoza v. Lynaugh,</u> 989 F.2d 191, 193 (5th Cir. 1993) (citing <u>Wilson v. Seiter,</u> 111 S. Ct. 2321, 2323 (1991) (at a minimum prisoner must allege deliberate indifference to serious medical needs)).  As noted above, the state of mind necessary under the deliberate-indifference standard is an extremely high bar to surmount.  <u>See Domino,</u> 239 F.3d at 756.

As discussed previously, the medical records confirm that PA Reilley's diagnosis of contusion was based on x-rays that were reviewed by two radiologists, who determined that there was no fracture in Davis's right foot.[303]  PA Reilley relied on the radiologists' report when diagnosing a contusion on September 6, 2017, and treated Davis accordingly with crutches and pain

---

[302]Plaintiff's Second MSJ, Docket Entry No. 90, p. 1.

[303]CMC Radiology Report, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 119.

medication for his injured foot.[304]  A second set of x-rays taken by PA Faust a week later on September 13, 2017, yielded the same result: no fracture.[305]  Although a fracture in Davis's toe was not diagnosed until he had a CT scan on September 28, 2017, Davis does not demonstrate that PA Reilley or any of the other defendants who relied on the x-rays denied him access to timely medical care for his injured foot with the requisite deliberate indifference.

The medical records, which are summarized above, reflect that Davis's access to follow-up care for his continued complaints of foot pain was delayed for reasons unrelated to PA Reilley's initial diagnosis.  As Dr. Adams notes, any perceived delays in Davis's care or resolution of his complaints of foot pain were due to (1) his failure to follow medical advice, and (2) his serial admissions to crisis management.[306]  Davis does not dispute that he received two x-rays after his foot was injured on September 4, 2017, and that he was given pain medication along with instructions to elevate his foot.  Davis also does not dispute that he was transferred several times to receive psychiatric care at the Jester IV Unit for his suicidal behavior, and he does not otherwise supply any facts showing that officials unreasonably prioritized

---

[304]CMC Addendum Note, Exhibit 5 to Adams Affidavit, Docket Entry No. 81-3, p. 116.

[305]CMC Radiology Report, Exhibit 8 to Adams Affidavit, Docket Entry No. 81-3, p. 164.

[306]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 24.

his mental health over any of his other needs.

Likewise, Dr. Adams notes that Davis was not denied care after the CT scan revealed a fractured toe.[307]   The medical records confirm that when Davis returned to Jester IV Unit following the CT scan on September 28, 2017, Dr. Nguyen prescribed treatment for the fracture with buddy tape around the affected toe.[308]   Dr. Nguyen also requested a referral so that Davis could be seen by an orthopedic specialist,[309] which was scheduled for October 9, 2017, at the UTMB Hospital in Galveston.[310]   Davis was unable to keep that appointment because on October 6, 2017, Dr. Farley advised that it would need to be rescheduled due to Davis's status in crisis management at Jester IV.[311]   Davis was given a medical boot when he saw the orthopedic specialist at the UTMB Hospital on October 23, 2017, and was scheduled for another follow-up appointment in eight weeks.[312]

---

[307]Id. at 14-15.

[308]CMC MD/MLP Chart Review, Exhibit 16 to Adams Affidavit, Docket Entry No. 81-4, p. 23.

[309]CMC Inpatient Nursing Progress Note, Exhibit 17 to Adams Affidavit, Docket Entry No. 81-4, p. 28.

[310]Email from Shirley Nelson, Hospital Galveston, to Dr. Philip Farley, Exhibit B to Defendants' MSJ, Docket Entry No. 81, p. 154.

[311]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, p. 17 (citing Exhibit 19 to Adams Affidavit, Email Correspondence dated Oct. 6, 2017, Docket Entry No. 81-4, p. 90).

[312]CMC Return From Medical Appointment, Orthopaedic Foot Clinic Note, Exhibit B to Defendants' MSJ, Docket Entry No. 81, pp. 123-25; HG Offender Medical Pass, Exhibit 23 to Adams Affidavit, Docket
(continued...)

Dr. Adams notes that the delay in receiving a fracture boot for Davis's injured foot was also attributable to Davis's mental health condition, which included repeated episodes of suicidal behavior.[313] Dr. Adams explains that "[p]atients in Crisis Management who report active suicide, self-harm, and/or homicidal thoughts or threats are kept under strict observation and are only transferred off the [Jester IV Unit] for urgent or emergent situations."[314] Dr. Adams notes that Davis's fractured toe "was not a life or limb threatening emergency" and that his treatment providers correctly prioritized Davis's threats of self-harm when determining that he should remain under psychiatric observation.[315]

In addition, Dr. Adams notes that there is no evidence showing that Davis suffered a permanent disability as the result of any delay in receiving treatment for the toe that was fractured on September 4, 2017.[316] The medical records reflect that Davis had a follow-up appointment at the UTMB Orthopedic Clinic on December 21, 2017, where it was determined that his fractured toe had healed and that there was no "intrinsic pathology or instability" in his right

---

[312](...continued)
Entry No. 81-4, p. 182.

[313]Adams Affidavit, Exhibit E to Defendants' MSJ, Docket Entry No. 81-3, pp. 16-20.

[314]Id. at 18.

[315]Id.

[316]Id. at 25.

foot and ankle.[317] Although Davis was treated for generalized atrophy and osteopenia while being weaned off the fracture boot, the records reflect that Davis was found to be malingering or exaggerating his symptoms when the boot and his walker were discontinued.[318]

The record shows that Davis was transferred to the Jester IV Unit multiple times after the injury to his foot occurred on September 4, 2017, and that his placement in crisis management was necessary to address his mental health needs. Davis points to no evidence showing that any of the defendants in this case delayed his access to medical care with deliberate indifference to an excessive risk to his health. Morever, he points to no evidence showing that he suffered substantial harm as the result of the delay in receiving treatment from orthopedic specialists at UTMB Hospital for his fractured toe. Viewing all of the evidence in Davis's favor, he has not demonstrated that the defendants delayed

---

[317]UTMB Orthopedic Clinic Note - Dec. 21, 2017, Office Visit, Exhibit 24 to Adams Affidavit, Docket Entry No. 81-4, p. 216.

[318]CMC Clinic Notes dated January 16, 2018, Exhibit 25 to Adams Affidavit, Docket Entry No. 81-4, p. 221 (observing that Davis was ambulating with quick strides and without difficulty); CMC Inpatient Nursing Progress Note dated January 30, 2018, Exhibit 25 to Adams Affidavit, Docket Entry No. 81-4, p. 230 (reporting that Davis was seen walking unassisted and without difficulty, but then began to limp heavily when he noticed that he was being observed); CMC Clinic Notes dated January 31, 2018, Exhibit 25 to Adams Affidavit, Docket Entry No. 81-4, pp. 232-33 (noting that Davis was observed walking without difficulty without his walker before reporting to the clinic with a limp, but that he became belligerent and left the clinic without any limping after being confronted with the "amplification" of his symptoms).

his access to medical care with deliberate indifference or shown that he suffered substantial harm due to the delay, which was primarily caused by Davis's need for mental health treatment. Because Davis does not defeat the defendants' entitlement to qualified immunity, the Defendants' MSJ will be granted and the motions for summary judgment submitted by Davis will be denied.

## IV.   Conclusion and Order

Based on the foregoing, the court **ORDERS** as follows:

1.    Defendants' Motion for Summary Judgment (Docket Entry No. 80) is **GRANTED**.

2.    Plaintiff's [Motion for] Summary Judgment (Docket Entry No. 70) and [Second Motion for] Summary Judgment (Docket Entry No. 90) are **DENIED**.

3.    The civil action filed by Donald Lloyd Davis, Jr., will be dismissed with prejudice.

**The Clerk will provide a copy of this Memorandum Opinion and Order to the parties.**

**SIGNED** at Houston, Texas, on this the 6th day of June, 2023.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE